### CORRUGATING MACHINERY CORPORATION et al. v. PROGRESSIVE CORRUGATED PAPER MACHINERY CO., Inc.

### SAME v. EMPIRE CORRUGATED CONTAINER CORPORATION.

#### Nos. 4303, 4304.

District Court, E. D. New York.

Jan. 31, 1931.

I. Joseph Farley, of New York City, for plaintiffs.

Ward, Crosby & Neal, New York City, for defendants.

SLICK, District Judge.

Plaintiff Corrugating Machinery Corporation owns letters patent No. 1,235,319, issued July 31, 1917 to Jacob Huether. Plaintiff S. & S. Corrugated Machinery Company, Inc., is a licensee of coplaintiff, Corrugating Machinery Corporation. Defendant Progressive Corrugated Paper Machinery Company, Inc., manufactures a machine which plaintiffs allege infringes said patent, and defendant Empire Corrugated Container Corporation is a purchaser and user of one of the machines manufactured by its codefendant, Progressive Corrugated Paper Machinery Company, Inc. Suit was brought by plaintiffs against each defendant. The cases were tried together and on the same evidence.

The patent in suit was issued on a machine for affixing strips of adhesive tape to folded box blanks uniting the joints making a complete box out of a blank. The manufacture of corrugated boxes dates back to 1900, and in 1906 the railroads uniformly accepted shipments packed in corrugated boxes. After this action by the railroads the industry grew very rapidly, until in 1928 over one million tons of corrugated board were used for the manufacture of boxes and over one billion boxes are made and taped every year.

When corrugated boxes were first manufactured, tape to join the edges was applied by hand, and the work was necessarily slow, cumbersome, and unsatisfactory. In 1912 a patent for affixing tape to corrugated blanks was issued to James F. Wells, and Harry B. Harlow, known as the Wells-Harlow patent. In 1913 a patent was issued for a machine for this purpose to Tobias E. Raffel, known as the Raffel patent. The Huether patent, so far as the record in this case discloses, was the next patent issued for machines of this nature. When Huether applied for a patent, he laid great stress upon the fact that his invention was intended to simplify the construction of such machines, make them more rapid and efficient, and utilize the moving blank of corrugated paper to carry the forward end of the tape to its correct position,

preparatory to its being pressed onto the blank at a "predetermined point."

The tape, under his construction, was advanced downward to a point in the path of the advancing corrugated paper blank, where its lower end hung suspended "at rest," so that the edge of the blank, as it advanced rapidly, swept the end of the tape forward with the blank under a presser roll, which operated to affix the sticky side of the tape to the blank at the proper and predetermined place. To use the exact language of counsel for plaintiffs, he did the unusual thing—"he ejected some four inches of wet, limp tape, leaving it wholly out of control of all supporting mechanism, and then made the blank pick up the tape, adjust it on the surface of the blank, and sweep it onto the presses." The presser roll then operates to affix the tape on the blank at the desired place.

It should be noted that in making some boxes the tape is affixed to the blank from end to end, while in others it is affixed at a predetermined point some distance from the forward end, and some distance from the rear end of the blank. In other words, in the latter box the forward end of the tape is applied at some distance from the forward end of the blank, and does not reach to the rear edge of the blank.

The parties litigant agree that only claim 5 of plaintiffs' patent is in controversy. If defendants' machine does not come in conflict with claim 5 of the Huether patent, there is no infringement.

A study of claim 5, together with the language used in the other claims, and the file wrapper, forces the conclusion that plaintiffs' invention is bottomed upon two main features, namely: (a) Feeding the tape downward until its lower end hangs "at rest" in the path of the advancing blank, by which it is swept forward under a presser roll; (b) a pair of presser rolls, one of which oscillates (moves away from and towards the other roller), so that it operates to press upon the tape, and affix it to the blank at any point desired. If these two features are ignored or removed from plaintiffs' machine, then there is no perceptible difference betwen it and a machine built under the Wells-Harlow patent. In other words, these two features are the only points of distinction between plaintiffs' patent and the prior patented art as exemplified, at least, by the Wells-Harlow patent.

The Wells-Harlow, and other patents, provided machines to do the same work that plaintiffs' patent covers. His object in perfecting his patent, as described in the specifications therefore, was to improve on the tape-feeding and tape-applying mechanism of the older machines. He says in his specifications that "the objects of my invention are to improve upon and simplify the construction of such machines; to provide a machine which is adapted to rapidly and efficiently perform its work, and wherein the movement of the blank is utilized to assist in feeding and applying the tape. * * * In applicant's device the pressing device is movable relative to the blank."

Plaintiffs' claim 5 should be construed in the light of the history of this patent as disclosed by the file wrapper. The original application and specifications were much broader than the patent as granted. Numerous claims were disallowed because the Commissioner of Patents was of the opinion that they were already covered by prior patents. Claim 5 was finally allowed for the very obvious reason that it described a device in which the tape was brought to a position "at rest" in the path of the advancing blank, and the oscillating presser roll affixed the tape at a predetermined point. Plaintiffs' patent is therefore limited or narrowed down to these two points. If not, it would conflict with the prior patented art, and for that reason would be invalid.

Three patents issued prior to plaintiffs' patent are in evidence. These, in the order of their issuance, are the patent to Woodard, September 18, 1893, to Wells and Harlow, December 3, 1912, and to Raffel, December 9, 1913. In all these inventions we find certain common characteristics. They all have a blank feeder or carrier, a tape feeder or conveyor, a tape presser or device for applying the tape where desired, a tape cutter for severing the tape when enough has been drawn, and many other similar features.

The question for decision in this case is, Does defendants' machine, as constructed and operated, infringe upon claim 5 of plaintiffs' patent? This claim (5) is brief and plain. It is couched in concise language, and is easy to understand. In its entirety it reads as follows:

"In a machine of the character described, in combination, a blank feeder, a tape feeder, a tape presser, and a tape cutter, the tape feeder operating to feed the tape downward to a position wherein its lower end hangs at rest in the path of the advancing edge of the blank so that as the blank advances it sweeps the tape-end forward under the presser, the presser operating to affix the tape-end to the

face of the moving blank at any desired place thereon so that as the blank continues in its movement it draws an additional quantity of tape which passes under the presser and is thereby affixed to the blank, the cutter operating, while the tape is being drawn, to cut a strip of desired length."

It will be noted that it described a machine with a blank feeder. Defendants' machine has a blank feeder, but so do the three prior patents just described. It has a tape feeder. Defendants' machine also has a tape feeder, as do the three other machines. It has a tape presser, and a tape cutter, as do defendants' and the prior patents. It described the tape feeder as operating "to feed the tape downward to a position wherein its lower end hangs 'at rest' in the path of the advancing edge of the blank, so that as the blank advances it sweeps the tape-end forward under the presser."

An examination of figure I of the Huether application, which is described as a side view of the machine embodying the Huether invention, discloses that the tape is fed downward from the reel supplying the tape; the reel being located practically above the place where the tape finally "hangs at rest in the path of the advancing edge of the blank." In defendants' machine the tape supply is above, but not directly over the point where the tape and blank are brought together, and the tape is fed, not downward, but downwardly, until it is within approximately eight to twelve inches of the presser rolls, whence it travels towards the presser rolls in practically a horizontal line, continuing until it contacts with the belt driven by the upper roll, and by which it is deflected downwardly to a point where it meets the advancing blank. The machine is adjusted and timed so as to bring the forward end of the tape and the point on the blank, where it is to be affixed, together at the exact time when they arrive at the bite of the rolls. The advancing edge of the blank does not sweep the end of the tape along with it, and the tape is never "at rest" until it is affixed to the blank by the presser. This operation of defendants' machine is very similar to the operation of the Wells-Harlow machine, and is entirely different from the teaching of the Huether patent. Huether drops the tape perpendicularly, or nearly so, and holds the end thereof in the path of the on-coming blank edge. Defendants project the tape horizontally, or nearly so, and cause it to travel at such speed and in such direction as that the forward end thereof meets the blank at the bite of the

presser rolls. They both accomplish the same result, namely, they both get the forward end of the tape and the point on the blank where it is to be attached under the presser rolls at the same time, but by entirely different methods.

Plaintiffs argue that, while the tape in defendants' machine is moving and in plaintiffs' machine it is "at rest," at the time when it contacts with the blank, yet the tape-feeding mechanism in defendants' machine has, to all intents and purposes, ceased its operation, and for that reason defendants' tape is, for all practical purposes, "at rest." This is a very ingenious argument, and it is not lacking in plausibility. However, Huether in his specifications describes the end of the tape, not the feeding mechanism, as being "at rest" —"its lower end hangs at rest in the path," etc.

Webster's New International Dictionary defines "rest" and "at rest" as follows: "Rest—repose; cessation or intermission of motion, exertion or labor; freedom from activity; quiet. At rest—repose; quiet; tranquil."

If plaintiffs' tape is "at rest," it is not moving, and, if defendants' tape is moving, it is not "at rest." Further, as above indicated, the advancing edge of the blank in defendants' machine does not sweep the tape into position under the presser roll, as it is described as doing in the Huether invention.

The Huether patent claims a pair of rollers for pressing the tape onto the blank, one of which oscillates. Defendants' machine does not have this mechanism; neither do the machines manufactured and put out by plaintiffs. Both plaintiffs and defendants have nonoscillating presser rolls. Neither one of these machines follows the Huether patent in this regard.

For reasons assigned, the court is of the opinion that defendants' machine does not infringe plaintiffs' patent, and the bill will be dismissed with costs as to each defendant.

With reference to warnings to the trade sent out by plaintiffs, the court feels that plaintiffs were honest in their belief that a real case of infringement existed, and, this being so, they were probably justified in issuing reasonable warnings to the trade. It is to be presumed, now that decision is rendered adverse to plaintiffs' claim, that plaintiffs will desist from issuing such warnings, so long at least as this decision stands. If plaintiffs persist in such conduct, then will be time enough for the court to act.